**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| REBECCA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   13-cv-279-CJP[1] |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Rebecca Jackson is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.   For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. §  405(g).

## PROCEDURAL HISTORY

Rebecca Jackson applied for benefits in August 2009 alleging disability since September 10, 1999 primarily due to back pain (Doc. 11-7, p. 84).   Her application was denied initially and upon reconsideration (Doc. 11-3, pp. 7–9). Administrative Law Judge (ALJ) Robert O'Blennis held an initial evidentiary

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 9).

hearing as well as a supplemental hearing, and subsequently denied the application for benefits in a decision dated February 13, 2012 (Doc. 11-2, pp. 12–20).   Ms. Jackson's request for review was denied by the Appeals Council, and the February 13, 2012 decision became the final agency decision (Doc. 11-2, p. 2).   Ms. Jackson has exhausted her administrative remedies and has filed a timely complaint in this court seeking judicial review of the ALJ's adverse decision.

<u>**ISSUES RAISED BY PLAINTIFF**</u>

In her brief, Ms. Jackson raises the following issues: In assessing her residual functional capacity, (1) the ALJ erred in weighing the medical opinions; and (2) the ALJ failed to consider evidence of pain and long-term depression.

<u>**APPLICABLE LEGAL STANDARDS**</u>

**A.    Disability Standard**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statute.[2]   For this purpose, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

techniques.   42 U.S.C. § 423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit.   20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled: (1) is the claimant presently unemployed; (2) does the claimant have an impairment or combination of impairments that is severe; (3) does the impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, can the claimant perform past relevant work; and (5) is the claimant capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

**B.   Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   This Court reviews the decision to ensure that it is supported by substantial evidence and that no mistakes of law were made.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Jackson was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300,

306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See*, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.   The ALJ "must provide an accurate and logical bridge between the evidence and her conclusion that a claimant is not disabled."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required."   *Kastner*, 697 F.3d at 646 (quoting *Steele v. Barnhart*,   290 F.3d 936, 940 (7th Cir. 2002) (internal quotation marks omitted).

## **THE DECISION OF THE ALJ**

ALJ O'Blennis denied Ms. Jackson's claim on February 13, 2012 in a written decision (Tr. 11–19).   The ALJ followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520 (*See* Tr. 11–19).   At step one, the ALJ determined that Ms. Jackson had not engaged in substantial gainful activity since the alleged onset date

of September 10, 1999 (Tr. 18).   The ALJ also found that Ms. Jackson is insured for DIB through September 30, 2002 (Tr. 18).

At step two, the ALJ found that before September 30, 2002, Ms. Jackson had several severe impairments: (1) degenerative disc disease of the lumbosacral spine with very intermittent radiculopathy symptoms; (2) one episode of antral gastratritis and reflux esophagitis; and (3) mild anxiety controlled by medication (Tr. 18).   At step three, the ALJ determined that Ms. Jackson's impairments did not meet or equal a listed impairment (Tr. 18).

Between steps three and four, the ALJ concluded that Ms. Jackson had the residual functional capacity to perform work at the medium exertional level (Tr. 19).   At step four, the ALJ concluded that Ms. Jackson could return to her past work as an insurance customer service representative (Tr. 19).   As a result, Ms. Jackson was not disabled prior to her date last insured (Tr. 19).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Ms. Jackson in her complaint.

### 1.   Agency Forms

Rebecca Jackson was born in July 1967, and was 32 years old on the alleged disability onset date—September 10, 1999 (Doc. 11-7, p. 74).   She was insured for DIB through September 30, 2002 (*Id.*).   Ms. Jackson claimed she was disabled due to back pain, degenerative disc disorder, asthma, and migraines (Tr. 352).

She indicated that she filed for disability primarily because of her back pain (Tr. 368).

Ms. Jackson worked for an insurance company from 1991 until early 1996 (*See* Tr.262–63, 292).  She did not work for the remainder of 1996, in 1997, 1998, 1999, or 2000 (*See* Tr. 263–264).  She was self-employed from 2001 to 2003, but she earned less than $2,500.00 each year (Tr. 264).  She was a substitute teacher at St. Mary's Catholic School in 2005, 2007, and 2008, and in those years she earned $60.00, $174.00, and $30.00, respectively (Tr.  264).  She did not work in 2006, 2009, 2010, or 2011 (Tr. 264).

Ms. Jackson gave information regarding her daily activities and medications, but there is no indication if that information applied to the time of her alleged onset date in September 1999 to the date she was last insured in September 2002 (*See* Tr. 357–58, 368, 381, 391).

**2.    Initial Evidentiary Hearing**

Ms. Jackson was represented by counsel at the initial hearing on October 19, 2011 (Tr. 53).  The ALJ indicated that the time period relevant to this disability determination was from the alleged onset date in September 1999 through September 2002 when Ms. Jackson was last insured for disability benefits (Tr. 57).

Ms. Jackson testified that she was now 44 years old and she lived with her husband, James, and their three daughters who were 12, 14, and 16 (Tr. 57, 58).

While she was self-employed from 2001 to 2003, she worked arranging necktie displays at department stores (Tr. 60–61).  She worked approximately

three days a month, but it caused such severe pain in her lower back and down her leg that she would spend the remainder of the month recuperating (Tr. 62, 82–84). She would lay on the couch for the entire day and her children would watch a video or play with their toys (Tr. 83).   She also testified that the last time she tried to work as a substitute teacher in 2008, she only worked for half a day and the school never called her again because she "couldn't handle it," meaning she couldn't stand or sit in order to teach (Tr. 60).

Ms. Jackson testified she chose her onset date of September 10, 1999 at random (Tr. 63–64).   However, she could not work at that time or before because she "was going through so many epidural injections [that she] had to always be laying down" (Tr. 64).   She further testified that at that time she could not stand for more than 20 minutes because her leg would give out, and she could not sit for long (Tr. 64).   Ms. Jackson stated that since 1999 she has generally spent her days in bed (Tr. 66).   As a result, her mother had to take care of her children (Tr. 66).

The ALJ asked Ms. Jackson about her functional abilities during the relevant time period, but he moved on before she gave a complete answer (*See* Tr. 73).   The ALJ then asked Ms. Jackson about her hobbies and interests during the relevant time period (Tr. 73).   She played soccer, but stopped playing sometime after her first child was born in 1995 (Tr. 75).   She said she also loved playing tennis and fishing, but has not been able to do either since her children were little (Tr.   74–75).   She stopped reading in 1998 because she couldn't look down and her hands would go numb holding the book (Tr. 76).   She said she used to be a very social

Page 7 of 25

person, but she stopped going out after her last daughter was born because she stopped driving at that time (Tr. 77).   Her mother would sometimes come pick her up just to get her out of the house (Tr. 80–81).

Ms. Jackson testified that she has been under the constant care of one doctor or another for as long as she can remember (Tr. 83–84).   She has taken numerous medications since 1999 (Tr. 69–70).   She received injections in her back from several doctors (Tr. 69–70).   Before she had back surgery, she tried acupuncture, chiropracty, massage, and physical therapy (Tr. 72).

After Ms. Jackson testified, James Israel, a vocational rehabilitation counselor testified.   The ALJ asked the VE one hypothetical question.   That question required the VE to assume a person of Ms. Jackson's age, education, and work experience who

- Could perform work at the sedentary level, meaning that person could lift 10 pounds on occasion; could stand and/or walk about two hours out of every eight-hour day with normal breaks; and could sit for six hours with normal breaks;
- Should avoid working bilaterally above shoulder level;
- Should avoid forcefully push and pull above the 10 pound limit more than occasionally;
- Should avoid operating foot controls more than occasionally;
- Could occasionally bend or stoop, and climb ramps and stairs;
- Should never crawl or kneel; climb ladders, ropes, or scaffolds; work at unprotected dangerous heights; work around unprotected machinery; or work at extreme temperatures

(Tr. 86–87).

The VE testified that there are semi-skilled, as well as unskilled, sedentary jobs that exist in significant numbers in the St. Louis metropolitan area that the

hypothetical person could perform (Tr. 88–89).   However, the hypothetical person would be precluded from the unskilled sedentary jobs if she had to miss more than two days a month or if she had to randomly arrive late or leave early once a week for medical reasons (Tr. 89–90).   The VE stated that accepting Ms. Jackson's testimony about her functional abilities as true would mean she could not sustain work (Tr.   90).

**3.     Supplemental Evidentiary Hearing**

A supplemental hearing was held on February 1, 2012 because additional evidence had been submitted and the ALJ wanted professional input regarding Ms. Jackson's functional capacity and whether she met a listing during the relevant time period (Tr. 31).   Ms. Jackson was represented by counsel at the supplemental hearing (Tr. 27).

Dr. Woodrow Janese testified as a medical expert. (Tr. 34).   He noted that during the time period at issue Ms. Jackson complained about lower back pain, neck pain, and pain in her right leg (Tr. 35).   There was no particular injury or source of trauma that caused her pain, and she did not have any surgery during the time period at issue (Tr. 34, 35, 36).   She was in her early thirties and in good shape (Tr. 36).   Based on that information, Dr. Janese concluded that Ms. Jackson did not meet a listing for her lower back or her neck (Tr. 36).   He further concluded that she had the residual functional capacity to perform work at the medium exertional level, meaning she could lift 50 pounds occasionally, lift 25 pounds frequently, and sit or stand for up to six hours (Tr. 36).   Dr. Janese opined

that there were no additional postural or environmental limitations supported by the record (Tr. 36).

Ms. Jackson then testified and disputed Dr. Janese's opinion (Tr. 49).   She said that, during the time period at issue, she had just had a child and she couldn't even take care of her baby (Tr. 50).   Ms. Jackson also speculated that some of Dr. Prather's records were missing because there were only notes from three visits, but she recalled receiving more than three injections before her first surgery (Tr. 50).

**4.    Medical Records**

There are no medical records dating back to the alleged onset date of September 10, 1999, or any records preceding that date.   The first record is from Ms. Jackson's initial visit to Dr. Margaret Reiker in October 11, 2000 (Tr. 442–43). Dr. Reiker is an internist and Ms. Jackson's general care physician; a number of visits and medical treatments prescribed by Dr. Reiker are not mentioned here because they are not particularly relevant to Ms. Jackson's arguments.   Ms. Jackson was referred to Dr. Reiker by her OB/GYN because she complained of mood swings, irritability, and poor sleep, and she wanted to try an antidepressant (Tr. 442).   Dr. Reiker prescribed Zoloft (Tr. 443).   On November 9, 2000, Ms. Jackson had a follow-up visit with Dr. Reiker (Tr. 441).   She reported feeling better on the Zoloft and the dosage was increased from 100 mg to 150 mg (Tr. 441). Dr. Reiker refilled Ms. Jackson's prescriptions for Zoloft on a number of occasions throughout 2001 and 2002 (*See* Tr. 436–39).   Dr. Reiker also gave Ms. Jackson a prescription for amitriptyline for her headaches in December 2001 (Tr. 438).

Ms. Jackson saw Dr. Heidi Prather for the first time on January 4. 2001 (Tr. 595).   Dr. Prather is an osteopath who specializes in physical medicine and rehabilitation.[3]   Ms. Jackson told Dr. Prather that she had lower back pain and right lower extremity pain intermittently through all three (3) pregnancies, and persistent pain since her last pregnancy in 1999 (Tr. 595).   Dr. Prather noted that Ms. Jackson exhibited pain with forward flexion, with slump-sit, and with AP glides along the L4–5, 5–1 region, and also that her ILA depths were slightly asymmetric (Tr. 596).   All other results were negative or within normal limits (*See* Tr. 596). She also recommended physical therapy and discussed the use of injections if Ms. Jackson was having considerable leg pain (Tr. 596).   She prescribed Darvocet to help Ms. Jackson sleep at night (Tr. 596).

Ms. Jackson had an MRI of her lumbar spine the day after her visit with Dr. Prather (Tr. 456).   The MRI showed degenerative disc disease at L5-S1 with disc protrusion lateralizing to the left within the canal extending into the foramen on the left with mild effacement of descending left S1 nerve root and the exiting left L5 nerve root; and a bulging disc in the inferior foramen on the left at L4-5, which was diffuse and relatively mild. (Tr. 456-57).

On February 12, 2001, Ms. Jackson reported to Dr. Prather that she continued to have "lower extremity pain" and a difficult time sleeping at night (Tr.

---

[3] This information was found by searching Washington University's directory of physicians for "Prather." The directory is available at http://www.wuphysicians.wustl.edu/directory.aspx.   The entry for Dr. Prather is available at http://www.wuphysicians.wustl.edu/physician2.aspx?PhysNum=2727.   A biography for Dr. Prather is also available on the Washington University Orthopedics website at http://www.ortho.wustl.edu/content/Patient-Care/2715/FIND-A-PHYSICIAN/Physician-Directory/Heidi-Prather-DO/Publications.aspx.

593).   She reported using up to six Ultram per day for pain control (Tr. 593).   Dr. Prather noted that Ms. Jackson exhibited pain with forward flexion and with slump-sit with tibial bias (Tr. 593).   Dr. Prather's diagnosis was right L-5 radiculopathy with a known history of a herniated disc at L5-S1 (Tr. 593).   Dr. Prather planned a repeat injection at the right S-1 region, refilled Ms. Jackson's Ultram and also prescribed Doxepin to help her sleep at night (Tr. 593).

Ms. Jackson visited Dr. Prather again on November 1, 2001 and reported increasing pain on her left side compared to the right, particularly when sitting, flexing her spine, and bending over (Tr. 591).   Dr. Prather noted that Ms. Jackson's slump-sit was positive for pain with increasing tibial bias and chin tuck bilaterally, her hip range of motion was restricted in rotation, and she had extremely poor control of her abdominal muscles (Tr. 591).   Dr. Prather recommended a repeat injection, refilled Ms. Jackson's Ultram, and referred her to Dr. Clayton Skaggs at Clayton Physical Medicine (Tr. 591).

On November 5, 2001, Ms. Jackson was taken to the emergency room at Anderson Hospital in Maryville, Illinois after intentionally overdosing on prescription Vicodin (Tr. 1186).   She was tearful and stated that she was sorry, and she had been arguing with her husband, and she "just wanted to sleep" (Tr. 1188).   She was diagnosed with depression (Tr. 1194).

Another record from the relevant time period shows that Ms. Jackson had an MRI of her pelvis and lumbar spine on August 16, 2002 (Tr. 1065–68).   The MRI of her pelvis showed a small hemangioma in the L5 vertebral body (Tr. 1065).   The

MRI of her lumbar spine showed the same disc degeneration and bulging disc at
L5-S1 as the January 2001 MRI (Tr. 1068).   It also showed a concentric annular
tear at L5-S1 and an impingement upon and slight posterior displacement of the
left S1 nerve root/sheath due to the bulging disc (Tr. 1068).

On December 30, 2002, Ms. Jackson underwent a lumbosacral myelography
at Christian Hospital Northeast (Tr. 416–422).   The images showed a small central
and left-sided disc protrusion at L5-S1 causing minimal impingement on the left S1
nerve root (Tr. 417–20).   Dr. Jonathan Gold recommended a lumbar myelogram
to rule out further compression, but thought Ms. Jackson's problem was probably
degenerative disc disease (Tr. 417).

## 5. Consultative Examination

Dr. Bud Chomhirun examined Ms. Jackson in October 2000 in connection
with her application for benefits (Tr. 528–33).   There is no information in the
report regarding her symptoms and limitations during the relevant time period.

## 6. State Agency RFC Assessments

There was no RFC assessment completed by a state agency physician.

## 7. Dr. Heidi Prather's Opinion

Dr. Prather submitted a letter to Ms. Jackson's attorney, Dennis Fox, dated
October 18, 2011—the day before the initial evidentiary hearing (Tr. 1227–28).
Dr. Prather indicated that she has treated Ms. Jackson on and off since 2001 (Tr.
1227).   Dr. Prather stated in relevant part:

In 2001, when I first saw her, she was a homemaker but was unable to do regular activities of daily living for child care including sit and stand for more than 30 minutes at a time, lift, carry, push, or pull more than 20 pounds at a time as she described difficulty with lifting a jug or even child care.   Before September of 2002, I did not place restrictions on the patient but simply her impairment limited these activities.

It is my opinion that these limitations have continued throughout the years since that initial visit.   The evidence that supports this opinion is purely based on the patient's report of her ability to do activities to me.   Her objective testing over the years has shown that she has had multiple disc herniations, initially treated with lumbar disc replacement followed by lumbar fusion and again cervical radiculopathy related to disc herniation and treated with cervical fusion.   These have also triggered headaches and she has had many other psychosocial events that have interplayed with this including depression and anxiety because of constant chronic pain.

Ms. Jackson's working diagnosis is, since my evaluation in 2002 eventually was low back pain, lumbar radiculopathy; also neck pain and cervical radiculopathy and she has also had a diagnosis of cervicogenic headache.   Because of the patient's description of pain, her limitations on physical exam, and her imaging that eventually showed disc protrusions, it would be my opinion that she would not have been able to hold a job consistently from the time I saw her in 2001 to the current time.   Clearly, she has had some episodes and time periods where things have gotten better but she has had chronic pain problems since then, from the time of my initial visit, that she has described actually began in October of 2000.

8.   **Evidence Not Before the ALJ**

The transcript contains evidence that was not part of the record at the time the ALJ issued his decision (*See* Tr. 22–24).   Specifically, Ms. Jackson submitted letters from her family regarding her conditions, which appear in the transcript at pages 401–14 and were designated by the Appeals Council as Exhibits 22E through 29E.   These letters were submitted to the Appeals Council, which considered them in connection with her request to review the ALJ's unfavorable decision (Tr. 5).

Because the Appeals Counsil eventually refused Ms. Jackson's request, it is not appropriate for the Court to consider evidence that was not before the ALJ. "Although technically a part of the administrative record, the additional evidence submitted to the Appeals Counsel cannot now be used as a basis for a finding of reversible error." *Rice v. Barnhart*, 384 F.3d 363, 366, n.2 (7th Cir. 2004); *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

## ANALYSIS

### A.    Medical Opinions

Ms. Jackson's first argument is that, in assessing her RFC, the ALJ improperly weighed the medical opinions.   The record contained medical opinions from two physicians regarding Ms. Jackson's functional limitations and ability to work during the relevant time period.   Dr. Heidi Prather, one of Ms. Jackson's treating physicians, gave a retrospective assessment and opined that Ms. Jackson "would not have been able to hold a job consistently from the time I saw her in 2001 to the current time" (Tr. 591–597; 1227).   Dr. Prather indicated that her opinion was based on Ms. Jackson's description of her pain and activities of daily living, as well as diagnostic imaging including MRIs and xrays, and objective observations made during physical examination.   Dr. Woodrow Janese, a non-examining medical expert, gave a contrary assessment of Ms. Jackson's functional limitations during the relevant time period.   He opined that Ms. Jackson's RFC was "medium, as defined [including lifting] 50 pounds occasionally and 25 pounds frequently, six hours of sitting and six hours of standing" (Tr. 36).   Dr. Janese's conclusion was

based solely on a review of Ms. Jackson's medical records.   Ultimately, the ALJ rejected Dr. Prather's opinion in favor of Dr. Janese's testimony that Ms. Jackson was capable of performing a full range of medium work during the relevant time period,

Ms. Jackson argues that the ALJ erred in failing to articulate the weight given to each medical opinion in accordance with the factors enumerated in the federal regulation.   Ms. Jackson further argues that the ALJ erred by failing to explain why he credited the opinion of the non-examining medical expert over the opinion of the treating physician.   According to Ms. Jackson, had the ALJ properly considered the checklist of factors enumerated in the regulation, he would have afforded more weight to Dr. Prather's opinion which would have changed the outcome of the case. The Court agrees.

A treating physician's opinion is not entitled to controlling weight if there is well-supported contradicting evidence in the record.   *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).   If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must decide what weight that opinion, as well as any other medical opinion in the record, deserves in accordance with the checklist provided in the federal regulations.   *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (internal citations omitted); 20 C.F.R. §§ 404.1527(c) and (e).   The regulations require the ALJ to consider the treatment relationship including the length, nature, and extent of the relationship and the frequency of examinations; the supportability

and consistency of the opinion with the record as a whole; whether the physician is a specialist; and any other factors the claimant or others bring to the ALJ's attention. *Moss*, 555 F.3d at 561 (internal citations omitted); 20 C.F.R. § 404.1527(c)(2).

Even if the ALJ properly concluded that Dr. Prather's opinion did not deserve controlling weight, the ALJ erred by failing to indicate what weight it did deserve, as well as what weight Dr. Janese's opinion deserved. The ALJ also said nothing regarding the required checklist of factors; he did not make a general statement that he considered the opinion evidence in accordance with the federal regulation, much less explicitly address how any factor influenced his decision to reject Dr. Prather's opinion in favor of Dr. Janese's. Simply put, there is absolutely no explanation as to why Dr. Janese's opinion of Ms. Jackson's abilities was more consistent with the evidence and deserved more weight than Dr. Prather's.

Several of the factors support the conclusion that Dr. Prather's opinion should be given great weight. Dr. Prather has treated Ms. Jackson on and off for ten years. During those ten years, Dr. Prather has examined Ms. Jackson on over 40 occasions. She has prescribed a variety of medications and non-surgical treatments, and eventually referred Ms. Jackson to surgeons when the non-surgical treatments proved ineffective. Her findings are consistent throughout the course of her treatment and show progressively worsening symptoms and pathology.

Dr. Janese, on the other hand, was brought in to testify as a medical expert at

the supplemental hearing about Ms. Jackson's functional capacity.   He never examined her nor treated her, and his testimony showed an unfamiliarity with the medical records and Ms. Jackson's condition during the relevant time period.   For example, Dr. Janese did not answer what, if any, diagnosis Ms. Jackson maintained between September 1999 and the end of 2002 (*See* Tr. 34–35).   He also disputed whether Dr. Prather was a treating physician and claimed that Dr. Prather did not have any contact with Ms. Jackson during the relevant timeframe (Tr. 37).   He was shuffling through the records while testifying, and indicated at least twice that he was uncertain about dates (*See* Tr. 35).   Additionally, it appears that his opinion is based largely, if not entirely, on the overall lack of objective medical evidence that would explain the degree and type of pain that Ms. Jackson reported (*See* Tr. 40–45).[4]   However, "[m]edical science confirms that pain can be severe and disabling even in the absence of "objective" medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant."   *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).   Finally, Dr. Janese's opinion that Ms. Jackson was capable of medium work is not consistent with the record as a whole.   In fact, prior to receiving Dr. Janese's opinion, the ALJ thought the record showed Ms. Jackson had the RFC to

---

[4] Dr. Janese's testimony is difficult to follow, however, it appears to the Court that he was arguing that the type and degree of pain Ms. Jackson reported did not correspond with the findings of the MRI and the physical examinations (*See* Tr. 40–45).   Put differently, the MRI and physical examinations showed abnormalities, but the pain and symptoms that a person would be expected to experience based on those abnormalities is not what Ms. Jackson reported.   The pain that Ms. Jackson reported actually corresponds with abnormalities that were not present on the MRI or physical examinations.

perform sedentary work at best (*See* Tr.   86–87).

If Dr. Prather's opinion was fully credited, it supports a finding that Ms. Jackson did not have the residual functional capacity to perform any work. Consequently, she would be found disabled as of her date last insured.   Because the determination of whether benefits are warranted depends largely on the weight afforded to Dr. Prather's opinion, the Court concludes that this matter must be remanded to the ALJ to determine if Dr. Prather's opinion deserves controlling weight, and if not, what weight it does deserve.

**B.   Ignoring Evidence that Supports Ms. Jackson's Claim**

Ms. Jackson's second argument is that the ALJ erred in assessing her RFC because the ALJ failed to consider evidence that supported Ms. Jackson's claims of pain and long-term depression.   In assessing a claimant's RFC, an ALJ must consider all of the relevant evidence in the case record, and evaluate the record fairly.  *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545(a)(1) and (3).   While the ALJ need not discuss every piece of evidence in the record,  the ALJ may not ignore an entire line of evidence that is contrary to his findings.  *Id.* (citing *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) and *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)).   Otherwise it is impossible for a reviewing court to make an informed review.   *Golembiewski*, 322 F.3d at 917 (citing *Smith v. Apfel,*  231 F.3d 433, 438 (7th Cir. 2000)).

Turning first to Ms. Jackson's depression, the Court finds that the ALJ adequately considered the effects of depression on her RFC.   Ms. Jackson points

to a number of statements that she claims the ALJ ignored (Doc. 17, p. 13). However, those statements were given after the relevant time period and spoke to her limitations in recent years without shedding any light on whether those limitations were present before October 2002. The ALJ correctly noted that the only evidence from the relevant time period regarding depression was a prescription for Zoloft and one emergency room event for an overdose in November 2001 where she was diagnosed with depression (Tr. 15). The ALJ further noted that neither this evidence nor any other evidence demonstrated that Ms. Jackson's depression imposed any restriction or limitation on her ability to work during the relevant time period. The ALJ concluded that "in terms of mental functioning, the claimant had no limitation or no more than a minimal limitation in her ability to do basic work activities" (Tr. 17). The decision shows that, contrary to Ms. Jackson's argument, the ALJ did not reject the diagnosis or ignore Ms. Jackson's depression. Instead, he expressly considered depression in assessing her RFC.

Turning next to whether the ALJ adequately considered the effects of Ms. Jackson's pain on her RFC, the Court finds that he did not. The ALJ concluded that there was "no persuasive medical reason why the claimant . . . could not have performed a full range of medium work" during the relevant time period (Tr. 15). In support of this conclusion, the ALJ noted that:

(1) The MRIs showed degenerative disc disease at two lumbosacral spine disc levels, but no disc herniation, spinal stenosis, or definite nerve root impingement or compression;

(2) No doctor who treated or examined Ms. Jackson stated or implied that she was disabled or seriously incapacitated for any extended

length of time during the relevant time period;

(3) No doctor placed any specific, long-term limitations on Ms. Jackson; any restrictions on her daily activities were self-imposed;

(4) Ms. Jackson, did not have regular medical attention or treatment;

(5) She did not have any surgeries or inpatient hospitalizations;

(6) She did not suffer from "any significant, uncontrollable adverse side effects" of the medications she took; and

(7) She "did not have most of the signs typically associated with chronic, severe musculoskeletal pain," such as muscle atrophy, muscle spasms, neurological deficits, signs of nerve root impingement, inflammatory signs, bowel and bladder dysfunction, inability to ambulate effectively, inability to perform fine and gross movements, and use of assistive device to walk (Tr. 16).

The ALJ's conclusion, however, is compromised because he mentioned only the medical evidence favoring the denial of benefits, some of which he mischaracterized.

First, with respect to reason number one, the ALJ discounted the significance of Ms. Jackson's MRIs taken before October 2002 by remarking that they showed only "degenerative disc disease," but no herniation, stenosis, or nerve root impingement or compression.  But according to Dr. Prather, the MRI from January 2001 showed "a herniated disc at L5-S1" (Tr. 593).   And the MRI report from August 2002 clearly states the herniated disc was causing "impingement upon and slight posterior displacement of the left S1 nerve root/sheath" (Tr. 1167). Therefore, there is no basis to sustain the ALJ's assessment of Ms. Jackson's MRIs.

Second, with respect to reason number two, the ALJ either unintentionally overlooked or completely ignored Dr. Prather's opinion regarding Ms. Jackson's ability to work prior to October 2002.   Dr. Prather stated that Ms. Jackson "would not have been able to hold a job consistently from the time I saw her in 2001 to the

current time" due to her chronic pain (Tr. 1227).   Therefore, the ALJ's finding that no treating or examining physician opined that Ms. Jackson was disabled or seriously incapacitated is contrary to the evidence and cannot be sustained.

Third, with respect to reason number four, the ALJ noted that Ms. Jackson saw Dr. Prather for her back pain on only three occasions during the relevant time period.   Based on that, the ALJ concluded that Ms. Jackson did not receive regular medical attention or treatment during the relevant time period (Tr. 16).   However, the evidence indicates there were other visits to other physicians and other treatments during the relevant time period or shortly thereafter.   While the medical records from these visits and treatments are not part of the administrative record in this case, it is still clear that they exist.   And the simple fact of their existence seriously undermines the ALJ's conclusion that Ms. Jackson received only sporadic medical attention and treatment.

For example, based on the content of Dr. Prather's January 2001 note, it appears that Ms. Jackson had an additional appointment, or at the very least additional contact, with Dr. Prather where she prescribed a transforaminal epidural steroid injection which Ms. Jackson received in late January 2001 (*See* Tr. 593).   However, there are no records from the follow-up visit and/or from the injection procedure.   Ms. Jackson also testified at the supplemental hearing that she visited Dr. Prather more than three times during the relevant time period and she thought there were records missing.

Additionally, Dr. Prather's February 2001 note indicated that Ms. Jackson had started physical therapy with Tracy Spitznagle, who is a doctor of physical therapy with a specialist certification in women's health at Washington University in St. Louis.[5]   Dr. Prather's November 2001 note indicated that Ms. Jackson had seen Dr. Dan Riew.   Dr. Riew is an orthopaedic surgeon at Washington University who specializes in cervical spine surgery.[6]   And Dr. Prather's November 2003 note, indicated that Ms. Jackson received some trigger point injections sometime in the preceding two years (Tr. 589).   However, there are no records from Ms. Jackson's visit(s) with Dr. Spitznagle, Dr. Riew, or the physician who prescribed or administered the injections.

The August 2002 MRI report indicates that Dr. Prather was the physician who requested the lumbar MRI (Tr. 1067), but there are no records from a corresponding visit with Dr. Prather.   Likewise, Dr. Jonathan Gold performed a lumbar myelogram in December 2002, and common sense dictates that before Ms. Jackson would have been able to schedule this specialized procedure with a neurosurgeon, she would have had to see him on a previous occasion or be referred by another physician.   However, there are no such records.

Therefore, contrary to the ALJ's finding, it is clear that during the relevant

---

[5] This information was found by searching Washington University's directory of physicians for "Spitznagle."   The directory is available at http://www.wuphysicians.wustl.edu/directory.aspx.   The entry for Dr. Spitznagle is available at http://www.wuphysicians.wustl.edu/physician2.aspx?PhysNum=3083.

[6] This information was found by searching Washington University's directory of physicians for "Riew."   The directory is available at http://www.wuphysicians.wustl.edu/directory.aspx.   The entry for Dr. Riew is available at http://www.wuphysicians.wustl.edu/physician2.aspx?physnum=794.   A biography for Dr. Riew is also available on the Washington University Orthopedics website at http://www.ortho.wustl.edu/content/Patient-Care/2783/FIND-A-PHYSICIAN/Physician-Directory/K-Daniel-Riew-MD/Bio.aspx.

time period or shortly thereafter, Ms. Jackson saw a progression of doctors including her OB/GYN, her general care physician, a physical medicine and rehabilitation specialist, a doctor of physical therapy, an orthopaedic surgeon, and a neurologist.   The doctors tried to pinpoint the origin of her pain using physical examinations, xrays, MRIs, and a myelogram.   She tried over the counter medications; prescription pain relievers, including narcotics and opioids; epidural steroid injections; trigger point injections; physical therapy; and she got an opinion on her candidacy for surgery.   Therefore, the ALJ's finding that Ms. Jackson did not receive regular medical attention and treatment is not supported by substantial evidence and cannot be sustained.

Finally, the ALJ either entirely ignored or, at a minimum, failed to mention medical evidence that supported Ms. Jackson's claims of chronic, severe back pain. For example, the ALJ made no mention of Dr. Prather's physical examinations which indicated that Ms. Jackson had pain with forward flexion, pain with slump-sit, decreased range of motion in her hips, and extremely poor control of her abdominal muscles (Tr. 591–96).   Additionally, the ALJ made no mention of the type, dosage, and effectiveness of the pain medications Ms. Jackson used during the relevant time period.   While the ALJ does not have to address every piece of evidence in the record, the ALJ must explain why evidence which appears to favor Ms. Jackson was overcome by the evidence on which he relied.   *Zurawski*, 245 F.3d at 889.

In conclusion, the ALJ failed to mention or mischaracterized particularly

critical evidence in the record making an informed review of the ALJ's decision impossible.   A remand is necessary for a redetermination of Ms. Jackson's residual functional capacity.

<u>CONCLUSION</u>

Because of the ALJ's errors in assessing Ms. Jackson's residual functional capacity, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Jackson is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Rebecca Jackson's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   April 22, 2014**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**